Sealed
Public and unofficial staff access
to this instrument are
prohibited by court order

**FILED**

JUN 15 2023

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | **SEALED** |
| | § | |
| v. | § | Case No. 4:23CR 136 |
| | § | Judge Mazzant |
| OLABODE THOMAS AJIBOLA (2) | § | |
| | § | |

**INDICTMENT**

THE UNITED STATES GRAND JURY CHARGES:

**General Allegations**

At all times material to the facts set forth in this Indictment:

***The Defendants and related entities***

1.     Defendant                                    was an individual residing in McKinney, Texas, in the Eastern District of Texas.     controlled and managed the following business organizations, which were located and operated in McKinney, Texas, in the Eastern District of Texas:

     a.  Ajide Technology Corporation

Indictment
Page 1 of 22

  b. Smooth Multi-Services Platform

  c. Obello Solutions Corporation

  d. Obello, Inc.

  e. Yembell

  f. DOBIT

 2. Defendant **Olabode Thomas Ajibola ("Ajibola")** was an individual residing in Carlsbad, New Mexico. Preferred Oil & Gas Services, LLC ("Preferred") was a business that was organized and operated in Midland, Texas. **Ajibola** was the managing member of Preferred.

 3. Defendant        was an individual residing in Midland, Texas. Dfash Transportation, LLC ("Dfash") was a business that was organized and operated in Midland, Texas.    was the organizer and registered agent of Dfash.

 4. Defendant         was an individual residing in Midland, Texas.      was a business organization located and operated in Midland, Texas.   was the registered agent of Kenny.

 5. Defendant          was an individual residing in Spring, Texas. B-Light Services ("B-Light") was a business that was organized and operated in Frisco, Texas, in the Eastern District of Texas.   was a manager and the registered agent of B-Light.

6.    Defendant                                       was an individual residing in Odessa, Texas.                                       was a business that was organized and operated in Odessa, Texas.                     was the managing member and registered agent of Victor.

7.    Defendant                                       was an individual residing in Dallas, Texas.                                       was a business that was organized and operated in Dallas, Texas.

8.    Defendant                                       was an individual residing in McKinney, Texas, in the Eastern District of Texas.                                       was a business that was organized and operated in Garland, Texas.                     was the Chief Executive and registered agent of

9.    Defendant                                       was an individual residing in Princeton, Texas, in the Eastern District of Texas.  S-O-Y was a business that was organized in Colorado.                     was affiliated with S-O-Y.

10.    Defendant                                       was an individual residing in Katy, Texas.                                       was a business that was organized in Colorado and operated in Odessa, Texas.                     was the incorporator and registered agent of

11. Defendant                                    was an individual

residing in Wylie, Texas, in the Eastern District of Texas.

was a business that was organized and operated in Dallas, Texas.          was the sole

proprietor of

### The Small Business Administration

12. The United States Small Business Administration ("SBA") was an

executive-branch agency of the United States government that provided support to

entrepreneurs and small businesses. The mission of the SBA was to maintain and

strengthen the nation's economy by enabling the establishment and viability of small

businesses and by assisting in the economic recovery of communities after disasters.

13. As part of this effort, the SBA enabled and provided for loans through

banks, credit unions, and other lenders. These loans have government-backed

guarantees.

### The Paycheck Protection Program

14. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was

a federal law enacted in March 2020 and designed to provide emergency financial

assistance to the millions of Americans who were suffering the economic effects caused

by the COVID-19 pandemic. One source of relief provided by the CARES Act was the

authorization of forgivable loans to small businesses for job retention and certain other

expenses, through a program referred to as the Paycheck Protection Program ("PPP").

15.    To obtain a PPP loan, a qualifying business was required to submit a PPP

loan application, which was signed by an authorized representative of the business. The

PPP loan application required the business (through its authorized representative) to

acknowledge the program rules and make certain affirmative certifications in order to be

eligible to obtain the PPP loan. In the PPP loan application (SBA Form 2483), the small

business (through its authorized representative) was required to state, among other things,

its: (a) average monthly payroll expenses, and (b) number of employees. These figures

were used to calculate the amount of money the small business was eligible to receive

under the PPP. In addition, businesses applying for a PPP loan were required to provide

documentation showing their payroll expenses.

16.    A PPP loan application was processed by a participating lender. If a PPP

loan application was approved, the participating lender funded the PPP loan using its own

monies, which were guaranteed by the SBA. Data from the application, including

information about the borrower, the total amount of the loan, and the listed number of

employees, was transmitted by the lender to the SBA in the course of processing the loan.

17.    PPP loan proceeds were required to be used on certain permissible

expenses, including payroll costs, mortgage interest, rent, and utilities. Under the

applicable PPP rules and guidance, the interest and principal on the PPP loan is eligible

for forgiveness if the business spent the loan proceeds on these expense items within a

designated period of time and used a certain portion of the loan towards payroll

expenses.

### *The Economic Injury Disaster Loan Program*

18.     The Economic Injury Disaster Loan ("EIDL") Program was an SBA program that provided low-interest financing to small businesses, renters, and homeowners in regions affected by declared disasters. The CARES Act authorized the SBA to provide EIDLs up to $2,000,000 to eligible small businesses experiencing substantial financial disruption due to the COVID-19 pandemic. In addition, the CARES Act authorized the SBA to issue advances of up to $10,000 to small businesses within three days of applying for an EIDL. The amount of the advance was determined by the number of employees the applicant certified having. The advances did not have to be repaid.

19.     In order to obtain an EIDL and advance, a qualifying business was required to submit an application to the SBA and provide information about its operations, such as: (1) the number of employees, (2) gross revenues for the 12-month period preceding the disaster, and (3) cost of goods sold in the 12-month period preceding the disaster. The 12-month period for EIDLs for COVID-19 relief was from January 31, 2019, to January 31, 2020. The applicant was also required to certify that all the information in the application was true and correct to the best of the applicant's knowledge.

20.     EIDL applications were submitted directly to the SBA and processed by the agency with support from a government contractor, Rapid Finance. The amount of the loan, if the application were approved, was determined based on the information

provided by the applicant about employment, revenue, and cost of goods, as described

above. Any funds issued under an EIDL advance were issued directly by the SBA.

EIDL funds could be used for payroll expenses, sick leave, production costs, and

business obligations, such as debts, rent, and mortgage payments. If the applicant also

obtained a loan under the PPP, the EIDL funds could not be used for the same purpose

as the PPP funds.

## COUNT 1

Violation: 18 U.S.C. § 1349
(Conspiracy to Commit Wire Fraud)

21.    From approximately in or around April 2020, and continuing through the

date of this Indictment, the exact dates being unknown to the Grand Jury, in the Eastern

District of Texas, and elsewhere, the defendants,

### OLABODE THOMAS AJIBOLA

along with others, both known and unknown to the grand jury, did knowingly and

willfully conspire and agree to violate 18 U.S.C. § 1343, wire fraud, that is, to transmit

and cause to be transmitted by means of wire communication in interstate and foreign

Indictment
Page 7 of 22

commerce any writings, signs, signals, pictures, and sounds for the purpose of executing

a scheme and artifice to defraud and for obtaining money and property by means of false

and fraudulent pretenses, representations, and promises.

### Overview of the Conspiracy

22.     The defendants, led by                                     executed a

scheme to defraud lenders and the SBA.          recruited co-conspirators to use an

existing business and to create a business to submit applications to obtain PPP funding.

Once enlisted,         assisted his co-conspirators with the application paperwork,

including fabricating supporting documentation and submitting the application through

the online portals.  On the applications, the defendants misrepresented material

information, such as the true nature of their business, the number of employees, and the

amount of payroll.  Based on these material misrepresentations, the SBA, and other

financial institutions on behalf of the SBA, approved and issued loans to the defendants.

Once in receipt of the fraudulently obtained funds, the defendants did not use the money

as intended, such as to pay employee salaries, cover fixed debt and utility payments, and

continue health care benefits for employees.  Instead, the defendants typically paid

transferred money to their personal accounts, and spent the funds on various personal

purchases.

### Purpose of the Conspiracy

23.     It was the general purpose of the conspiracy for the defendants and their co-conspirators to unlawfully and unjustly enrich themselves by obtaining PPP and EIDL loan proceeds through materially false and fraudulent pretenses, representations, and promises.

### Manner and Means of the Conspiracy

24.     The manner and means by which the defendants and their co-conspirators sought to accomplish the purpose of the conspiracy included, among others, the following:

a.   The defendants registered and used sham, non-operational businesses, and in other instances existing businesses, under which they could submit PPP and EIDL loan applications.

b.   The defendants opened bank accounts under their names and their businesses to receive, deposit, and transfer PPP and EIDL funds.

c.   The defendants submitted materially false and fraudulent PPP and EIDL loan applications, misrepresenting, among other things, the number of employees and monthly payroll expenses.

d.   The defendants submitted falsified and fabricated supporting documentation in support of their loan applications.

e.   The defendants submitted the applications and accessed their PPP and EIDL loan accounts using the internet, frequently from an internet protocol ("IP") address that resolved back to              residence in McKinney, Texas, in the Eastern District of Texas.

f.   The defendants used the PPP and EIDL funds for unauthorized personal purposes, including cash withdrawals, making luxury vehicle purchases, home improvements, and sending the money internationally via wire transfer.

g.  The defendants paid a portion of the PPP funds to co-conspirator

h.  The defendants caused transmissions that affected interstate commerce by sending wire transfers and by accessing and submitting the PPP and EIDL applications online.

## Acts in Furtherance of the Conspiracy

In furtherance of the conspiracy and to achieve its objects and purpose, the following acts, among others, were committed in the Eastern District of Texas and elsewhere.

### *Preferred Oil and Gas Services fraudulent PPP application*

25.  On or about March 16, 2021, Preferred Oil and Gas Services, LLC, ("Preferred") submitted a materially false PPP loan application to Amur Equipment Finance. **Olabode Thomas Ajibola ("Ajibola")** signed the PPP application as the primary contact and designated Wells Fargo Bank account number XXXXXX1473, in the name of Preferred ("Preferred Account 1473"), as the account to receive the loan funds. On the application, **Ajibola** certified that:

*The funds will be used to retain workers and maintain payroll; or make payments for mortgage interest, rent, utilities, covered operations expenditures, covered property damage costs, covered supplier costs, and covered worker protection expenditures as specified under the Paycheck Protection Program Rules; I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud.*

The Preferred PPP loan account was accessed electronically from IP address 12.11.136.106.

26.     On or about April 8, 2021, Preferred submitted a second materially false PPP loan application to Amur Equipment Finance to request a second draw on the original PPP loan. Again, **Ajibola** signed the second draw loan PPP application as the primary contact and designated the Preferred Account as the account to receive the loan funds. Once again, the Preferred PPP loan account was accessed electronically from IP address 12.11.136.106.

27.     The Preferred PPP application falsely stated that the business had 7 employees and had an average monthly payroll expense of approximately $44,533. In support of the PPP application, **Ajibola** submitted documentation, such as a copy of his driver's license, a voided check, an IRS 1120-S corporate tax return, an IRS 941 Quarterly federal tax document, financial statements, and an invoice.

28.     On or about March 18, 2021, Amur Equipment Finance funded the first draw PPP loan for Preferred and sent $111,332 to Preferred Account 1473.

29.     On or about June 14, 2021, Amur Equipment Finance funded the second draw PPP loan for Preferred and sent $111,332 to Preferred Account 1473.

### *Misuse of PPP funds*

30.     On January 11, 2020,         opened a business checking account at Wells Fargo Bank bearing account number XXXXXX0889, in the name of Corporation                        The mailing address for the

was          residence in McKinney, Texas, in the Eastern District of Texas.          was listed as the sole signer on Ajide Account 0889.

31.    On or about March 19, 2021, approximately one day after obtaining the first draw of the Preferred PPP loan, **Ajibola** obtained a cashier's check drawn from Preferred Account 1473, made payable to                 n the amount of $33,399.60. This amount equaled exactly 30% of the PPP loan funds provided to Preferred.          was not an employee of Preferred.

32.    On March 19, 2021, the cashier's check payable to Ajide was deposited into Ajide Account 0889. The balance in Ajide Account 0889 prior to the deposit of $33,399.60 was approximately $6,000.

33.    On March 22, 2021,          made a $27,795.07 payment to Dovenmuehle Mortgage, Inc ("Dovenmuehle"). Dovenmuehle was the mortgage company that, at that time, held the loan for          primary residence in McKinney, Texas, in the Eastern District of Texas. Without the $33,399.60 deposit from **Ajibola**, the payment by          to Dovenmeuhle would not have been possible.

34.    On April 19, 2021,          opened a business checking account at Navy Federal Credit Union, bearing account number XXXXXX1281, in the name of Ajide, ("Ajide Account 1281"). The mailing address for Ajide Account 1281 was in McKinney, Texas, in the Eastern District of Texas.          was listed as the sole signer on Ajide Account 1281.

35.     On or about June 18, 2021, approximately four days after obtaining the second draw of the Preferred PPP loan, **Ajibola** obtained a cashier's check from the Preferred Account, made payable to Ajide, in the amount of $33,399.60. This again equaled exactly 30% of the PPP loan funds provided to Preferred. Again,      was not an employee of Preferred.

36.     On June 25, 2021, the cashier's check payable to Ajide was deposited into Ajide Account 1281.      was the sole signer on Ajide Account 1281. The balance in Ajide Account 1281 prior to the deposit of $33,399.60 was approximately $8,000.

37.     On June 28, 2021,      sent five intra-bank transfers totaling $25,000 to Navy Federal Credit Union account number XXXXXX1002 ("Bello Account 1002"), a personal checking account held in the name of      The balance in prior to the deposit of $25,000 was approximately $230. Immediately upon deposit into Bello Account 1002,      transferred $20,000 into Navy Federal Credit Union account number XXXXXX2297, held in the name of Smooth Multi-Services Platform ("Smooth Account 2297").      is the sole signer on Smooth Account 2297.

38.     On June 30, 2021, $20,000 of the funds that originated from **Ajibola**, and transferred through Ajide Account 1281, were combined with other funds that were recently deposited into the Smooth Account 2297 by      into a $75,000 wire transfer, which was sent internationally to Nigeria.

### *Additional PPP loans that paid 22-32% to*

39.     Further, in support of the scheme, much like the Preferred loan received by

**Ajibola**, upon receipt of the PPP loans funds, many of the co-conspirators paid

approximately 22-33% of PPP funds received to          For instance:

Indictment
Page 15 of 22

Case 4:23-mj-01262   Document 1   Filed on 06/21/23 in TXSD   Page 16 of 22
Case 4:23-cr-00136-ALM-KPJ *SEALED*   Document 1   Filed 06/15/23   Page 16 of 22 PageID
#: 16

### *PPP loans obtained by Bello*

40.    On August 21, 2015,         opened a personal checking account at
Community America Credit Union bearing account number XXXXXX1701

The mailing address for                                    residence in
McKinney, Texas, in the Eastern District of Texas.         was listed as the sole signer on


41.    On May 18, 2017,         opened a personal checking account at Citibank,
N.A., bearing account number XXXXXX3173 ("Bello Account 3173").  The mailing
address for                              residence in McKinney, Texas, in the
Eastern District of Texas.        was listed as the sole signer on Bello Account 3173.

42.    On January 13, 2020,         opened a personal checking account at Wells
Fargo Bank bearing account number XXXXXX0897 (                         . The
mailing address for :                              residence in McKinney, Texas, in
the Eastern District of Texas.        was listed as the sole signer on Bello Account 0897.

43.    On October 2, 2020,         opened a business checking account at BB&T
bearing account number XXXXXX5834, in the name of Obello, Inc. ("Obello Account
5834").  The mailing address for                              residence in
McKinney, Texas, in the Eastern District of Texas.         was listed as the sole signer on

Case 4:23-mj-01262  Document 1  Filed on 06/21/23 in TXSD  Page 17 of 22
Case 4:23-cr-00136-ALM-KPJ *SEALED*  Document 1  Filed 06/15/23  Page 17 of 22 PageID
#: 17

44.     Further, in support of the scheme,       also obtained multiple PPP loans

for businesses that he owned and controlled.  For instance:

### *EIDL loans obtained by Bello*

45.     On June 18, 2021,       opened a business checking account at Navy

Federal Credit Union bearing account number XXXXXX8123, in the name of DOBIT

("DOBIT Account 8123").  The mailing address for DOBIT Account 8123 was

residence in McKinney, Texas, in the Eastern District of Texas.  :       was listed as the

sole signer on DOBIT Account 8123.

46.     Further, in support of the scheme,       also obtained multiple EIDL loans

for businesses that he owned and controlled.  For instance:

*Misuse of $89,900 in EIDL funds*

47.     On June 2, 2020, the EIDL funds totaling $89,900 were deposited by the SBA into

48.     In addition, on June 2, 2020, the $26,793.74 check from

represented 30% of the PPP loan funds paid to B-Light) was also deposited into

The balance in                         prior to these two deposits was approximately $20,562.47.

49.     On June 5, 2020,        wrote a $60,800 check made payable to Dodge City of McKinney for the purchase of a 2020 Dodge Ram 1500 truck, which is registered to

residence, in McKinney, Texas, in the Eastern District of Texas.

*Misuse of $499,900 in EIDL funds received by*

50.     From June 23, 2021, through June 30, 2021,        transferred approximately $261,000 from DOBIT Account 8123 to other personal and business bank

accounts he controlled. During this time frame, there were no other funds deposited into

DOBIT Account 8123.

  51. In addition to the outgoing transfers,   also made the following

purchases utilizing the EIDL funds that were deposited into DOBIT Account 8123:

    a. $72,064.10 payment to Goodlean, LLC for the purchase of solar panels, which were installed on

    b. $50,000 check made payable to Mercedes-Benz of McKinney for the purchase of a 2020 Mercedes-Benz G550 luxury automobile, which is registered to      residence, in McKinney, Texas, in the Eastern District of Texas.

    c. Two payments totaling $119,891.32 to Ally Bank to pay off two Dodge Ram trucks that were personally owned by

  52. The $261,000 of transfers to personal and non-affiliated companies owned

and operated by   combined with the $243,891.32 in purchases made by

completed depleted the $499,900 EIDL funds deposited into DOBIT Account 8123

  All in violation of 18 U.S.C. § 1349.

## NOTICE OF INTENT TO SEEK CRIMINAL FORFEITURE

1.     The allegations contained in Count One are hereby realleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeiture to the United States of America of certain property in which the defendants have an interest.

2.     Upon conviction of any violation of 18 U.S.C. § 1349, the defendants shall forfeit to the United States any property, real or personal, that constitutes or is derived from proceeds traceable to a violation of any offense constituting "specified unlawful activity," or a conspiracy to commit such offense, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

3.     The property that is subject to forfeiture includes, but is not limited to, a money judgment, and all interest and proceeds traceable thereto, representing the proceeds of the offenses, for which the defendants are jointly and severally personally liable.

4.     Pursuant to 21 U.S.C. § 853(p), as incorporated by reference by 18 U.S.C. § 982(b), if any of the forfeitable property, or any portion thereof, as a result of any act or omission of the defendant:

    a.     cannot be located upon the exercise of due diligence;

    b.     has been transferred or sold to, or deposited with, a third party;

    c.     has been placed beyond the jurisdiction of the court;

d.   has been substantially diminished in value; or

e.   has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States to seek the forfeiture of other property of the

defendants up to the value of the above-described forfeitable properties, including, but

not limited to, any identifiable property in the name of the defendants.

5.   By virtue of the commission of the offense alleged in this indictment, any

and all interest the defendants have in the above-described property is vested in the

United States and hereby forfeited to the United States pursuant to 18 U.S.C.

§§ 981(a)(1)(C) and 28 U.S.C. § 2461(c).

All pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), and the

procedures set forth at 21 U.S.C. § 853, as made applicable through 18 U.S.C.

§ 982(b)(1).

A TRUE BILL

**Original Signature on File**

GRAND JURY FOREPERSON

DAMIEN M. DIGGS
UNITED STATES ATTORNEY

SEAN J. TAYLOR
Assistant United States Attorney

6-15-2023

Date

Indictment
Page 21 of 22

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | **SEALED** |
| | § | |
| v. | § | Case No. 4:23CR 136 |
| | § | Judge Mazzant |
| OLAMIDE OLATAYO BELLO (1) | § | |
| OLABODE THOMAS AJIBOLA (2) | § | |
| DAMOLA YUSUF FASOROTI (3) | § | |
| KEHINDE SUNDAY ITIOLA (4) | § | |
| BRIGHT NNAMDI UWADILEKE (5) | § | |
| VICTOR CHIBUIKE NWEKE (6) | § | |
| JUSTICE NZUBE OGUEJI (7) | § | |
| NNAEMEKA EMMANUEL OGUEJI (8) | § | |
| SABUR OLAWALE YUSUFF (9) | § | |
| ABDULHAKEEN OLAYINKA | § | |
| SALAUDEEN (10) | § | |
| DUMBOR JOSEPHINE BARIBE (11) | § | |

## NOTICE OF PENALTY

### Count One

Violation:      18 U.S.C. § 1349
                (Conspiracy to Commit Wire Fraud)

Penalty:        A fine of $250,000, or twice the pecuniary gain to the defendant or
                loss of the victim(s), whichever is greater; imprisonment for not
                more than 20 years; and a term of supervised release of not more
                than 3 years.

Special
Assessment:     $100

Indictment
Page 22 of 22